JACKSON LEWIS LLP
220 Headquarters Plaza
East Tower, 7th Floor
Morristown, New Jersey 07960
(973) 538-6890
Gregory T. Alvarez
James M. McDonnell
ATTORNEYS FOR DEFENDANTS

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANTONIO J. ORNELAS and BETTY OSWALD, on behalf of themselves and those similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>HOOPER HOLMES, INC., a New Jersey Profit Corporation; HOOPER HOLMES, INC., d/b/a PORTAMEDIC, a New Jersey Profit Corporation; and HOOPER INFORMATION SERVICES, INC., a New Jersey Profit Corporation,<br><br>        Defendants. | Civil Action No. 3:12-cv-03106-JAP-DEA<br><br>Hon. Joel A. Pisano<br><br>Magistrate Judge Douglas E. Arpert<br><br>PURSUANT TO L. Civ. R. 78.1(b) DEFENDANTS HEREBY REQUEST ORAL ARGUMENT |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR EXPEDITED ORDER PERMITTING SUPERVISED NOTICE OF THIS ACTION TO POTENTIAL OPT-IN PLAINTIFFS AND CONDITIONAL CERTIFICATION OF THIS CASE AS A COLLECTIVE ACTION

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

PROCEDURAL BACKGROUND....................................................................... 3

FACTUAL BACKGROUND .............................................................................. 3

I.     Hooper Holmes, The Declarants, And The Varying Arrangements To
Provide Paramedical Services.................................................................. 3

     A.     Employee PEs ............................................................................... 4

     B.     Affiliate Entities........................................................................... 4

     C.     Independent Contractor PEs ......................................................... 5

           1.     PEs Determine The Dates, Times, And Locations In Which
They Are Willing To Accept Appointments, As Well As
The Manner In Which They Complete The Appointments. ....................... 6

           2.     PEs Receive A Piece Rate For All Services They Perform
And Do Not Maintain Any Record Of Time Spent On
These Activities .......................................................................... 6

           3.     PE Contractors Vary Widely In Terms Of Number Of
Appointments Completed, Time Required For This
Activity, And Reliance Upon HH For Income ............................. 7

II.     The Two Allegedly Representative Plaintiffs......................................... 9

     A.     Antonio Ornelas ......................................................................... 9

     B.     Betty Oswald.............................................................................. 11

ARGUMENT ..................................................................................................... 13

I.     Courts Deny Conditional Certification When Plaintiffs Fail To Show That
They Are Similarly Situated To The Putative Class Regarding An FLSA
Violation And When Adjudicating The Claims Will Require Extensive
Individualized Inquiries ........................................................................ 13

II.     Plaintiffs Fail To Meet Their Burden Of Showing That They Are Similarly
Situated Based On A Common Policy Or Plan Violating The FLSA ............... 16

III.    Plaintiffs Cannot Demonstrate That They Are Similarly Situated To The Putative Class With Respect To Alleged Employee Status Because This Inquiry Is Highly Individual And Fact-Sensitive...............................................................19

IV.    Whether Putative Class Members Performed Services For More Than Forty Hours In A Week Is An Entirely Individualized Matter That Is Not Amenable To Common Proof......................................................................................22

V.    Plaintiffs Are Not Adequate Class Representatives..........................................24

VI.    The Scope Of The Notice Plaintiffs Seek Is Vastly Overbroad And Not Consistent With The Class They Ask To Represent...........................................25

        A.    Plaintiffs' Request to Provide Notice Is Overbroad And Internally Inconsistent With The Class Plaintiffs Seek To Represent ...................................26

        B.    If Authorized, Notice Should Be Limited To Only Those Examiners With At Least 30 Orders In A Given Week........................................27

        C.    If Authorized, Notice Should Be Limited To Only Those Branches From Which Potential Class Representatives Performed Services......................28

CONCLUSION............................................................................................................28

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agostino v. Quest Diagnostics, Inc.*,
    256 F.R.D. 437,478 (D.N.J. 2009)................................................................26

*Amir v. Sunny's Exec. Sedan Svc.*,
    1:13-cv-161, at 3 (E.D. Va. July 30, 2013)......................................15, 27

*Andel v. Patterson-UTI Drilling Co.*,
    280 F.R.D. 287 (S.D. Tex. 2011).........................................................15, 19

*Archer v. Freedmont Mortg. Corp.*,
    2013 U.S. Dist. LEXIS 1824 (D. Md. Jan. 7, 2013)..............................15

*Bamgbose v. Delta-T Group, Inc.*,
    684 F. Supp. 2d 660 (E.D. Pa. 2010).................................................15, 20

*Baxter v. Palmigiano*,
    425 U.S. 308 (1976)...............................................................................24

*Bramble v. Wal-Mart Stores*,
    2011 U.S. Dist. LEXIS 39457 (E.D. Pa. Feb. 7, 2011) ....................13, 14

*Colson v. Avnet, Inc.*,
    687 F. Supp. 2d 914 (D. Ariz. 2010) ....................................................13

*Harriel v. Wal-Mart Stores, Inc.*,
    2012 U.S. Dist. LEXIS 97527 (D.N.J. July 13, 2012)...................13, 14, 18

*Hunter v. Sprint Corp.*
    346 F. Supp. 2d 113 (D.D.C. 2004) .......................................................14

*Kuebel v. Black & Decker, Inc.*,
    643 F.3d 352 (2d Cir. 2011)....................................................................10

*Li v. Renewable Energy Solutions, Inc.*,
    2012 U.S. Dist. LEXIS 22312 (D.N.J. Feb. 21, 2012) ...........................20

*Moore v. PNC Bank*,
    2013 U.S. Dist. LEXIS 74845 (W.D. Pa. May 29, 2013).......................14

*Pfaahler v. Consultants for Architects, Inc.*,
    2000 U.S. Dist. LEXIS 1772 (N.D. Ill. Feb, 8, 2000) .....................18, 19

*Scott v. NOW Courier, Inc.*,
    2012 U.S. Dist. LEXIS 43710 (S.D. Ind. Mar. 29, 2012)......................19

*SEC v. Graystone Nash, Inc.*,
   25 F.3d 187 (3d Cir. 1994)........................................................................................24

*Symczyk v. Genesis Healthcare*,
   656 F.3d 189 (3d Cir. 2011)...........................................................................13, 14, 23

*TJX Cos.*,
   853 F. Supp. 2d 317, 323 (E.D.N.Y. 2012) ............................................................18

*Vargas v. Gen. Nutrition Ctrs., Inc.*,
   2012 U.S. Dist. LEXIS 115614, at *4 (W.D. Pa. Aug. 16, 2012) ...........................14

STATUTES

29 U.S.C. § 207(a)(1)...................................................................................................22

29 U.S.C. § 216(b) ............................................................................................13, 14, 18

## INTRODUCTION

Plaintiffs have asked this Court to conditionally certify an opt-in class of thousands of individuals who allegedly perform similar duties paid on a facially lawful piece-rate basis, but who in all ***relevant*** respects are not similarly situated. The record demonstrates beyond dispute that the facts central to determining whether Defendants (collectively, "HH") are liable to any putative class member are unique to each individual, depend almost entirely on each claimant's testimony rather than documents, and vary significantly from person to person such that common proof of liability or damages is not possible. In short, one Plaintiff's experience is in no way representative of any other person's circumstances. Plaintiffs fail to meet their burden for the following reasons, each of which standing alone is ample basis to deny the motion:

*First*, Plaintiffs identify no common plan or policy that violates the Fair Labor Standards Act (the "FLSA"). They contend that the independent contractor paramedical examiners ("PE"s) perform similar duties and receive the same type of pay. Those facts, however, are simply not in dispute. Plaintiffs further contend that HH misclassified PEs as independent contractors rather than employees. The case law makes clear, though, that misclassification in and of itself does ***not*** violate the FLSA. Misclassification merely means that there is an employment relationship subject to the FLSA, not that a violation actually occurred. Plaintiffs point to no plan or policy that affects the putative class in a common way ***and*** violates the law.

*Second*, evaluating whether HH misclassified PEs requires a fact-intensive inquiry. The legal standard is the six-factor "economic reality" test, yet Plaintiffs offer scant evidence that they are similarly situated to ***each other*** with respect to their claimed status as employees, much less that they are similarly situated to the putative opt-in class. Plaintiffs thus fail to make even a modest factual showing that the economic reality issue, and thus whether the FLSA applies to all members of the putative class, is amenable to collective adjudication.

*Third*, even if the Court were to conclude that Plaintiffs and the putative opt-in class are similarly situated with respect to coverage under the FLSA, that would not resolve liability or damages.  All that a common finding of employee status would mean is that the FLSA's overtime provision applies to the putative class.  At that point, the case would involve thousands of individuals asserting FLSA claims, but without common or similar facts to show a violation.  To establish liability, each class member must still show services beyond 40 hours in a week.  As Plaintiffs' deposition testimony confirms, there are no records indicating the hours PEs spend on their duties.  Plaintiffs admit that they have no knowledge of the hours other PEs spend on activities for HH and that the ***only*** way to know whether any PE spends more than 40 hours in a week on these tasks is to ask that PE.  A proceeding requiring depositions and live trial testimony from thousands of opt-in plaintiffs is the antithesis of efficient collective litigation.

*Fourth*, the two Plaintiffs are plainly inadequate class representatives.  Their deposition testimony uniquely compromises their credibility, and indeed their ability to proceed in this litigation.  On core issues concerning claimed status as an employee, Antonio Ornelas gave deposition testimony flatly contradicting his own tax returns, while Betty Oswald refused to testify, instead repeatedly invoking the Fifth Amendment.  In light of these depositions, one or both Plaintiffs may be estopped from maintaining their claims against HH.  Plainly, both are inappropriate representatives for potentially thousands of other individuals.

Notwithstanding the relatively lenient standard for these motions, when, as here, it is apparent at the early stages of a case that trial would necessarily focus on individualized issues rather than common, class-wide issues, courts do not hesitate to deny conditional certification.  Certifying under these circumstances would serve no public policy.  HH respectfully submits that Plaintiffs have failed to carry their burden and that their motion should be denied.

## PROCEDURAL BACKGROUND

Plaintiffs' one-count Amended Complaint alleges that HH violated the FLSA by failing to compensate them and others supposedly similarly situated at a rate of one and one half times their regular rate of pay for hours spent in excess of forty in certain unspecified weeks. (ECF Docket No. 25, Am. Compl. ¶¶ 30-39.)   Plaintiffs have moved the Court for an order conditionally certifying the following putative class:

> All piece-rate paid "Paramedical Examiners," "Insurance Examiners," "Phlebotomists," and other individuals working for Defendants providing paramedical exams nationwide, who worked performing paramedical services for Defendants' benefit within the last three years, whose income was reported on IRS Form 1099, who worked in excess of 40 hours in one or more workweeks and were not compensated at one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in one or more workweeks.

(ECF Docket No. 25, Am. Compl. ¶ 47.)  Plaintiffs have asked that the putative class include all individuals who meet that description from February 5, 2010 to the present.

Plaintiffs define the class to include only those individuals "*who worked in excess of 40 hours in one or more workweeks*[.]"  (ECF Docket No. 25, Am. Compl. ¶ 47 (emphasis added).) They ask, however, that notice be given "to each of the contractor examiners *who worked for Defendants within the last three years*" (Pls.' Mem. at 13) (emphasis added), without regard to whether the recipient of the notice performed services more than 40 hours in a week.

## FACTUAL BACKGROUND

**I.   HOOPER HOLMES, THE DECLARANTS, AND THE VARYING ARRANGEMENTS TO PROVIDE PARAMEDICAL SERVICES**

HH provides paramedical services—e.g., physical examinations, specimen collections, electrocardiograms, and personal health interviews—for insurance industry clients through a network of PEs.  (Andrew Meixner Affidavit ("Meixner Aff.") at ¶ 2.)   HH provides these services nationwide by means of approximately 40 branches located throughout the country.

3

(*Id.*)  The network consists of employees, affiliate entities, and independent contractors who perform the paramedical services on behalf of the insurance industry clients, typically in connection with insurance applications.  (*Id.* at ¶ 3.)[1]

### A.    Employee PEs

HH employs PEs throughout its branches.  (Meixner Aff. ¶ 5.)  These employee PEs are at-will and receive assignments directly from HH.  (*Id.*)  HH policies require employees to record hours worked on timesheets and provide that employees receive time and one half for all hours worked in excess of 40 in a given workweek.  (*Id.* at ¶ 6.)  During the asserted class period Margaret King, who claimed she was an independent contractor in a declaration submitted in support of Plaintiffs' motion, was an HH employee who received IRS Form W-2.  (Claudia Metz Affidavit ("Metz Affidavit") at ¶ 2 and Exhs. A, B.)  Ms. King received no IRS Form 1099 income from HH during that time period.  (*Id.* at ¶ 2.)

### B.    Affiliate Entities

An HH branch may also contract with an independent affiliate entity that performs paramedical services and to which HH sells specific geographic regions or orders.  (Meixner Aff. ¶ 10.)  These affiliate entities are separate companies that employ or contract with their own PEs to perform paramedical services for insurance carriers or other paramedical exam companies.  (*Id.*)  HH requires the affiliate to submit a Criminal Background Check Authorization and Release Form on any individual proposed to complete an appointment on behalf of an insurance industry client.  (*Id.* at ¶ 11.)  The affiliate, not HH, then assigns the order to one of the affiliate's examiners to complete and, in turn, invoices HH for the services.  (*Id.*)

---

[1]    Still other independent contractors simply use HH as a "pass through billing" entity because HH is an authorized vendor for nearly every insurance carrier.  (Meixner Aff. ¶ 3.) Plaintiffs concede that PEs who simply use HH for billing should not receive notice.  (Pls.' Mem. at 11 *note* 1.)

Although two of Plaintiffs' declarants, Kristie Martin and Jessica Kuykendall, stated under penalty of perjury that they did not work for other entities and received an IRS Form 1099 from HH, those assertions are demonstrably wrong.  HH's records confirm both that they performed services for affiliate entities and that they did not receive an IRS Form 1099 from HH during the pertinent period.  (Metz Aff. ¶¶ 4, 5 and Exhs. E, F.)  Martin performed services for P&J Goldberg, Inc. of Frederick, Maryland which, in turn, invoiced HH for all services contracted to the affiliate including, *inter alia*, any appointments Martin may have completed. (*Id.* at ¶ 5 and Exh. F.)

Likewise, Kuykendall was a W-2 employee of HH as a PE from October 2008 to her May 28, 2010 resignation.  (*Id.* at ¶ 4 and Exhs. C, D.)  After resigning, Kuykendall performed paramedical services for Smith's Examination Services of Evansville, Indiana, an affiliate entity. (*Id.* at Exh. E.)  Smith's Examination Services invoiced HH directly for all paramedical services, including those completed by Kuykendall, performed on behalf of HH's insurance industry clients. (*Id.* at ¶ 4.)  HH did not issue Kuykendall an IRS Form 1099 during the pertinent period. (*Id.*)

## C.    Independent Contractor PEs

HH's network also consists of a group of independent contractor PEs who enter into a written agreement with HH regarding the terms of the contractor relationship.  (Meixner Aff. ¶ 8.)  In relevant part, this Agreement provides that a PE is: (a) free to set his/her own hours and to decline appointments; (b) not considered an employee of HH; (c) not controlled by HH with respect to the result accomplished or the details by which a result is accomplished; and (d) free to hold employment with or to perform services for other entities.  (Certification of Gregory T. Alvarez ("Alvarez Cert.") at Exhs. J, K.)  A PE receives a standard fee, which varies depending upon the services provided, to complete each assignment.  (Alvarez Cert. Exh. A, Antonio

Ornelas Deposition Transcript, at 58:4-12; Exh. B, Betty Oswald Deposition Transcript, at 239:21 to 240:25.)

1.   **PEs determine the dates, times, and locations in which they are willing to accept appointments, as well as the manner in which they complete the appointments.**

In addition to the Agreement, which states that a PE may perform services for others and is not controlled by HH, on a monthly basis a PE provides HH the dates, times, and geographic territories in which he/she is willing to accept appointments.  (Alvarez Cert. Exh. A at 96:23 to 98:4; Exh. B at 129:3 to 131: 10, 142:15 to 143:4.)   The PE performs services in the field, generally in private residences, without direct supervision from HH.  (Meixner Aff. ¶ 4.) Only one PE attends and completes each appointment.  (*Id.*)

2.   **PEs receive a piece rate for all services they perform and do not maintain any record of time spent on these activities.**

HH compensates PEs by the piece rate method, such that the PE receives a single fee for each completed examination and all activity related thereto such as travel and paperwork. (Meixner Aff. ¶ 7; *see also* Alvarez Cert. Exhs. J, K.)  HH does not track or record hours that PEs spend on this activity because of the independent contractor relationship.  (Meixner Aff. ¶ 9; *see also* Alvarez Cert. Exhs. J, K.)  By the same token, PEs do not record time spent on these activities, such as conducting examinations, traveling from appointment to appointment, or completing post-appointment paperwork.  (Alvarez Cert. Exh. A at 63:6 to 65:16, 89:2-7; Exh. B at 198:23 to 200:11.)

Plaintiffs testified in their depositions that PEs can only speculate as to how much time it took to conduct examinations, travel from appointment to appointment, and complete administrative paperwork.  (Alvarez Cert. Exh. A at 63:6-17, 83:6 to 84:17, 87:2 to 88:4, 90:12 to 91:12, 238:8-25, 247:1 to 248:25, 256:3-15, 260:1 to 262:25; Exh. B at 191:1-19, 198:23 to

200:14.)   Several variables necessarily affect any estimate of the time a PE previously spent. These factors include the complexity of the examination, cooperation of the client, the significance of the client's medical history, distance between appointments, traffic conditions, and the complexity of the administrative paperwork.  (Alvarez Cert. Exh. A at 76:17 to 78:4, 83:6 to 84:17, 87:2 to 88:4, 90:12 to 91:12, 247:25 to 248:12, 256:3-15, 260:8-20; Exh. B at 79:3 to 80:4, 87:10 to 88:24, 90:2-15, 176:1-24, 191:1-19, 192:3 to 193:22, 198:23 to 200:14)

> **3.    PE contractors vary widely in terms of number of appointments completed, time required for this activity, and reliance upon HH for income.**

No two days or weeks are the same for a PE.  (Alvarez Cert. Exh. B at 78:21 to 80:4.) Several PEs within the network receive, either by choice or lack of demand, a minimal number of appointments per week.  (Metz Aff. Exhs. G, I.)  The time required to complete appointments (inclusive of the examination, travel time, and paperwork) varies greatly depending upon the efficiency of the PE, cooperation of the client, traffic conditions, and other factors.  (*Compare* Alvarez Cert.  Exh. A at 76:17 to 78:15, 79:10-16, 80:5-16, 83:6 to 84:4, 248:9-12, 256:11 to 259:23, 260:8-20 *with* Alvarez Cert. Exh. B at 87:10 to 90:21, 97:3-15, 99:5 to 101:9, 175:3-18, 177:3 to 179:2, 191:1 to 195:22.)  For example, while Ornelas estimates his average appointment required 37 minutes to complete (Alvarez Cert. Exh. A at 240:2-16), Oswald testified that the average appointment required at least an hour.  (Alvarez Cert. Exh. B at 87:10-25.)

Similarly, Plaintiffs' declarants Johnson and Fears-Curry conducted very few examinations for HH.  ***Johnson completed just five appointments in her busiest week in the pertinent time period; Fears-Curry completed only seven appointments.***  (Alvarez Cert. ¶ 5 and Exh. C.)  Despite the minimal number of appointments, Johnson asserts she performed services more than 40 hours per week: "I typically worked 5 days a week, and worked approximately 8 to 10 hours per day."  (Johnson Decl. ¶ 14.)  Fears-Curry makes substantially the same assertion

regarding time she allegedly spent.  (Fears-Curry Decl. ¶¶ 14-16; *cf.* Metz Aff. Exh. G.)  Thus while the Plaintiffs testified that the appointments require 37 minutes or at least an hour, these two declarants effectively state that they require ***more than five hours per appointment*** (Fears-Curry [i.e., at least 40 hours for 7 appointments]) or ***more than eight hours per appointment*** (Johnson [i.e., at least 40 hours for 5 appointments]).

In addition, the total income PEs receive varies greatly, which has a direct effect on any claim of economic dependence, the central focus of the "economic reality" analysis.  (Metz Aff. Exhs. H, J; Alvarez Cert. Exhs. D, E.)  For example, Fears-Curry, a licensed physician who operates her own business *Fears Medical Touch* in Anniston, Alabama, received minimal income from HH during the statutory period: $1,707.07 in 2012; $868.89 in 2011; and $2,444.14 in 2010.  (Metz Aff. Exh. H; Alvarez Cert. Exh. G.)  Likewise, Johnson received only $1,802.72 in 2010.  (Metz Aff. Exh. J; Johnson Decl. ¶ 12.)  HH has no record of issuance of an IRS form 1099 to Johnson after 2010.  (Metz Aff. ¶ 9.)

The record is all but silent regarding the level of investment the declarants made in their paramedical businesses, as well as whether and to what extent they took deductions for business expenses, received income from other sources, or depended on HH as the sole source of income, all of which are factors in the economic reality test.[2]  At best, the declarations make conclusory allegations intimating that little or no investment is made.  However, as Ornelas' and Oswald's testimony shows (discussed below) these facts are highly individualized and very much disputed.

---

[2]   HH sought discovery (e.g., tax returns, depositions, appointment books, etc.) from the declarants as relevant to the issues of FLSA classification and liability.  Plaintiffs vigorously opposed HH's request, which the Court denied. (ECF Docket No. 36.)

## II.    THE TWO ALLEGEDLY REPRESENTATIVE PLAINTIFFS

### A.    Antonio Ornelas

From April 1, 2009 to December 2010, Ornelas completed appointments for HH as an independent contractor PE in only Massachusetts (April 2009 through November 2010) and Florida (December 2010).  (Alvarez Cert. Exh. I.)  Contrary to his declaration, Ornelas testified at his deposition that he decided the dates, times and hours he would be available for assignments from HH.  (Alvarez Cert. Exh. A at 96:7 to 97:1, 297:5-14.)  Moreover, contrary to his declaration, in each year of the statutory period, Ornelas earned more than half his annual income from sources other than HH, such as another paramedical exam company (Superior Mobile Medics), a part time job, and unemployment compensation benefits.[3]  (Alvarez Cert. Exh. F; Exh. A at 26:23 to 27:2, 31:19-23, 35:6-14; 100:9 to 101:25.)

Furthermore, despite his declaration stating that he was responsible for the costs of only **"minor"** supplies, Ornelas' 2010 tax returns show that in that year he invested $28,267 in his "business as an insurance medical examiner for Hooper Homes" compared to gross income of $17,519 from HH, i.e., a loss of over $10,000.  (Alvarez Cert. Exh. F; Exh. A at 157:3 to 158:25.)  Likewise, on his 2009 federal and state tax returns, Ornelas reported expenses (i.e., investment) in excess of $13,000 in connection with his paramedical examiner business for HH as compared to approximately $9,000 in income, for a reported loss of approximately $4,000. (Alvarez Cert. Exh. F; Exh. A at 127:25 to 128:21, 139:12-16, 146:8-23.)

Ornelas admitted never recording time spent on tasks for HH and conceded that any estimates would be speculative.  (Alvarez Cert. Exh. A at 63:6-17, 83:6 to 84:17, 87:2 to 88:4,

---

[3]    It remains unclear how Ornelas could be eligible for unemployment compensation benefits while at the same time claiming to be working full-time for HH, far more than 40 hours per week.  This circumstance casts further doubt on Ornelas' credibility and fitness to be a representative plaintiff.

90:12 to 91:12, 238:8-25, 247:1 to 248:25, 256:3-15, 260:1 to 262:25.)   Indeed, Ornelas conceded that his hours varied depending on many factors.   (*Id.*)   Nevertheless, Ornelas estimated that an average exam for him required 37 minutes plus an additional 15 minutes of post-appointment paperwork per exam.[4]   (*Id.* at 240:2-16.)  When confronted with GPS estimates of his travel time, Ornelas objected, asserting that estimates and projections fail to consider many variables and uncertainties such as traffic and time spent parking.  (*Id.* at 240:6 to 260:20, 320:25 to 321:14)  He concluded that *no* method can estimate the time spent conducting examinations or travelling between appointments.   (*Id.* at 261:1-25.)  In fact, Ornelas said that to obtain a reasonable *estimate* one must speak directly to the PE.    (*Id.* ("Talk to Richard. Talk to Howard.")).

Ornelas' production records show that the most orders he completed in a week during the statutory period was 27. (Alvarez Cert. Exh. A at 234:19 to 237:2; Exh. C.)  Therefore, based on his own estimate, and considering his most productive week, the maximum time Ornelas spent performing exams and doing post-appointment paperwork totaled 24.2 hours.  Additionally, even when the GPS estimated compensable[5] travel time is included for this same week, the total amounted to 32.8 hours, well below the forty-hour threshold to be eligible for overtime. (Alvarez Cert. Exh. A at 255:1 to 256:25.)  The same is true even if the GPS estimate is *doubled* and other potential variables such no-shows are included. (*Id.* at 255:25 to 259:23.)

---

[4]    This estimate is based on Ornelas' guess that it would take 30 minutes to complete an examination that does not involve an EKG, 45 minutes if an EKG is involved, and that half of his examinations involved the latter.  (Alvarez Cert., Exh. A at 240:2-13.)

[5]    Under the FLSA, time spent traveling to one's first appointment and home from the last is not considered "compensable".  29 C.F.R. § 785.35 ("An employee who travels from home before his regular workday and returns to his home at the end of the workday is engaged in ordinary home to work travel which is a normal incident of employment.  This is true whether he works at a fixed location or at different job sites."); *see also Kuebel v. Black & Decker, Inc.*, 643 F.3d 352, 360 (2d Cir. 2011) ("The general rule, however, is and always has been that the FLSA does not treat ordinary home-to-job-site travel as compensable.").

### B.    Betty Oswald

From May 28, 2009 to July 5, 2011, Oswald performed PE services only in the Broomall, Pennsylvania area.  (Alvarez Cert. Exh. B at 13:13-19.)[6]  Oswald admitted that she determined her own schedule by submitting the times during which she was willing to accept appointments. (*Id.* at 126:7 to 129:8, 131:5-10.)  Oswald also testified that she selected the zip codes in which she took appointments and the dates and times she was willing to perform services, and that she could "block off" time she did not want to complete examinations.  (*Id.* at 142:15 to 143:4, 147:21 to 148:13.)

Oswald *refused to testify* about matters critical to assessing the alleged misclassification, and instead asserted her Fifth Amendment privilege against self-incrimination.  For example, Oswald refused to testify as to whether she deducted expenses as a sole proprietor for investment or losses in her business or whether she obtained income from other sources, such as income from employers or from her own business:

> Q.    Did you file a Federal Tax Return in 2009?
> A.    Fifth.
> Q.    Did you file a State Tax Return in 2009?
> [...]
> A.    I plead the Fifth.
> Q.    Did you take deductions for home office expenses on your
>         tax returns for 2009?
> A.    I plead the Fifth.
> Q.    Did you take tax deductions for office expenses in 2009?
> A.    I plead the Fifth.
> Q.    Did you take deductions for automobile use in 2009?
> A.    I plead the Fifth.
> Q.    Did you take any deductions for losses from operating a
>         business in 2009?
> A.    I plead the Fifth.

---

[6]    Oswald also performed PE services on behalf of HH in years outside of the applicable statute of limitations.  (Oswald Decl. ¶ 4; Alvarez Cert. Exh. B at 12:12-20, 13:2-12.)

> Q.   Did you take any deductions for other self-employment—
>       did you take any self employment deductions in your 2009
>       tax returns?
> A.   I plead the Fifth.
>                           [...]
> Q.   Did you report any W-2 income in 2009?
> A.   I plead the Fifth.
>                           [...]
> Q.   Did you have any 1099 income in 1099 other than from
>       Hooper Holmes?
> A.   I plead the Fifth.

(Alvarez Cert. Exh. B at 119:16 to 121:18.)  Oswald did the same as to her 2010, 2011, and 2012

taxes.  (*Id.* at 121:21 to 122:5.)  In all, Oswald invoked the Fifth Amendment approximately 17

times, refusing to answer many questions bearing on her status as an independent contractor.

Oswald has no record of the hours she spent on activities for HH in any given week and

offered only general speculation that she often performed services more than forty hours.

Oswald estimated that she required one hour to complete each appointment and agreed that the

maximum number of appointments she completed in a single week was 26.  (*Id.* at 87:10-25,

200:21 to 201:8, 208:9-15.)  She also testified that she spent on average one hour completing

administrative paperwork for each assignment.  (*Id.* at 104:16-17.)

Oswald stated that "no two days" were the same for PEs with respect to appointments,

travel, and administrative tasks.  (*Id.* at 78:21 to 80:4.)  In fact, Oswald testified that to determine

a PE's time spent on these activities, one would need to make inquiries to each individual PE.

(*Id.* at 176:1 to 178:23.)  To that end, Oswald explained that the only way to determine how long

it took PEs to complete appointments or to travel from appointment to appointment would be to

ask each PE.  (*Id.* at 176:1 to 178:23, 185:1 to 188:6.)

Oswald could not testify as to what she did on a day-to-day basis or how much time she

spent performing tasks each day.  (*Id.* at 191:1-19.)  She testified that GPS estimates of travel

time could not reliably predict the amount of travel time spent by PEs due to variables such as

traffic, route, and speed.  (*Id.* at 192:3 to 193:22.)  Ultimately, Oswald admitted that she could

not identify any specific week in which she spent more than 40 hours, even when presented with

documentation of all appointments completed in a week.  (*Id.* at 198:23 to 200:8.)

## ARGUMENT

I.    **Courts Deny Conditional Certification When Plaintiffs Fail To Show That They Are Similarly Situated To the Putative Class Regarding An FLSA Violation And When Adjudicating The Claims Will Require Extensive Individualized Inquiries.**

The FLSA authorizes plaintiffs to pursue relief on behalf of themselves "and others

similarly situated."  29 U.S.C. § 216(b).  In the Third Circuit, a plaintiff seeking conditional

certification under the FLSA "must produce some evidence, 'beyond pure speculation,' of a

factual nexus between the manner in which the employer's alleged policy affected her and the

manner in which it affected other employees."  *Symczyk v. Genesis Healthcare*, 656 F.3d 189,

192-93 (3d Cir. 2011).   Although "plaintiffs' burden to establish a right to conditional

certification is modest, it is 'not nonexistent and the factual showing, even if modest, must still

be based on some substance.'"  *Bramble v. Wal-Mart Stores*, 2011 U.S. Dist. LEXIS 39457, at

\*16 (E.D. Pa. Feb. 7, 2011) (citations omitted) (unreported decisions attached to Alvarez Cert.)

(Alvarez Cert. Exh. L); *see also Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 929-30 (D. Ariz.

2010) ("Although the burden for certifying a FLSA lawsuit for collective action notification is

light, there are limits, and the district court cannot function as a rubber stamp for any and all

claims that come its way under this statute.").   In other words, although conditional certification

is "governed by a lenient standard, it is not automatic."  *Harriel v. Wal-Mart Stores, Inc.*, 2012

U.S. Dist. LEXIS 97527, at \*12 (D.N.J. July 13, 2012) (Alvarez Cert. Exh. M).

As Plaintiffs note, the focus of the Court's inquiry at this juncture "is not on whether

there has been an actual violation of law but rather on whether the Examiners are 'similarly

situated' under 29 U.S.C. § 216(b) with respect to their allegations that the law has been violated." (Pls.' Mem. at 26 (citing *Vargas v. Gen. Nutrition Ctrs., Inc.*, 2012 U.S. Dist. LEXIS 115614, at *4 (W.D. Pa. Aug. 16, 2012) (other citations omitted) (Alvarez Cert. Exh. N)).)  In other words, "class members in a collective must share more than a common allegation that they were denied overtime or paid below the minimum wage.  The class members must put forth a common legal theory *upon which each member is entitled to relief*."  *Hunter v. Sprint Corp.* 346 F. Supp. 2d 113, 119 (D.D.C. 2004) (emphasis added, internal citations omitted).

Similarly, plaintiffs seeking conditional certification "must produce some evidence, 'beyond mere speculation,' of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees." *Symczyk*, 656 F.3d at 193; *see also Harriel*, 2012 U.S. Dist. LEXIS 97527, at *13 ("A plaintiff must show a 'factual nexus' between his or her situation and the situation of other current and former employees sufficient to determine that they are similarly situated.").  "In spite of the modest factual nexus evidentiary standard, courts have not hesitated to deny conditional certification when evidence is lacking." *Harriel*, 2012 U.S. Dist. LEXIS 97527, at *12 (citations omitted); *see also Moore v. PNC Bank*, 2013 U.S. Dist. LEXIS 74845, *14 (W.D. Pa. May 29, 2013) (Alvarez Cert. Exh. O).

Importantly for this case, "Plaintiffs [even under the modest factual showing standard] may be found dissimilar on the basis of case management issues, including individualized defenses." *Symczyk*, 656 F.3d at 193 (citations omitted).  "Further, courts considering claims similar to those of plaintiffs have declined to grant conditional certification where consideration of the propriety of an employer's application of an exemption to its employees would require an individualized or fact sensitive analysis." *Bramble*, 2011 U.S. Dist. LEXIS 39457, at *23-24

(citing *Evancho v. Sanofi-Aventis U.S. Inc.*, No. 07-2266, 2007 U.S. Dist. LEXIS 93215, at *5 (D.N.J. Dec. 19, 2007) (declining to grant conditional certification where the evidence submitted by the parties indicated that employee responsibilities 'may vary among plaintiffs and potential collective action members") (Alvarez Cert. Exh. P); *Aguirre v. SBC Commc'n Inc.*, No. 05-3198, 2007 U.S. Dist. LEXIS 17259, at *15 (S.D. Tex. Mar. 12, 2007) (fact-intensive nature of the exemption analysis' coupled with plaintiffs' acknowledgment that employee duties varied between individuals sufficient to deny preliminary collective action certification) (Alvarez Cert. Exh. Q); *Forney v. TTX Co.*, No. 05-6257, 2006 U.S. Dist. LEXIS 30092, at *3 (N.D. Ill. Apr. 17, 2006) (conditional certification denied where "certification of a collective action required fact-intensive and individualized determination on each potential claimant's qualifications for FLSA exemption") (Alvarez Cert. Exh. R)). *See also Amir v. Sunny's Exec. Sedan Svc.*, 1:13-cv-161, at 3 (E.D. Va. July 30, 2013) (denying conditional certification because the plaintiff's claims were "individual, fact-intensive, and fact specific and would require individualized ad hoc inquiries for each plaintiff," thus demonstrating that the plaintiffs are not "similarly situated" and that allowing class claims "would not promote judicial economy") (Alvarez Cert. Exh. S); *Archer v. Freedmont Mortg. Corp.*, 2013 U.S. Dist. LEXIS 1824, *9 (D. Md. Jan. 7, 2013) (Alvarez Cert. Exh. T) (denying conditional certification where plaintiffs did not record hours worked and determining liability and damages "would require a complex reconstruction not only of the Plaintiffs' work hours, but also those of each member of the proposed class"); *Andel v. Patterson-UTI Drilling Co.*, 280 F.R.D. 287, 294-96 (S.D. Tex. 2011) (conditional certification denied in independent contractor misclassification case because court "must conduct an individualized analysis to determine whether each [putative plaintiff] is an employee or an independent contractor under the FLSA"); *Bamgbose v. Delta-T Group, Inc.*, 684 F. Supp. 2d

15

660 (E.D. Pa. 2010) (conditional certification denied to allegedly misclassified independent contractors because the court could not simply look to alleged "uniform classification of workers or its common payment procedures, intranet and telephone systems. Instead, it must determine whether the proof to demonstrate that the workers are 'employees' or 'independent contractors' can be applied to the class as a whole.").

As discussed below, Plaintiffs utterly fail to offer even "modest" evidence indicating that they are similarly situated with respect to each other or to the members of the putative class they wish to represent. Moreover, the record clearly demonstrates that the issues of whether the putative class members are employees subject to the FLSA as opposed to independent contractors, as well as whether each putative class member performed services for HH for more than 40 hours in a week (and if so, for how many hours in which weeks), are highly individualized, depend on facts unique to each putative class member, and depend heavily on each individual's testimony. Trial on a collective or representative basis is simply not feasible. Under these circumstances, courts routinely deny conditional certification.

## II.   PLAINTIFFS FAIL TO MEET THEIR BURDEN OF SHOWING THAT THEY ARE SIMILARLY SITUATED BASED ON A COMMON POLICY OR PLAN VIOLATING THE FLSA.

Plaintiffs seek certification based upon the following assertion: "Defendants failed to pay *all Examiners* in the putative class overtime premiums when they worked over forty (40) hours in a workweek, *pursuant to a common plan or scheme* whereby they erroneously classified all such Examiners as independent contractors." (Pls.' Mem. at 6-7 (emphasis added).) Plaintiffs further assert that, "based on its common misclassification of *all Examiners*, PORTAMEDIC failed to pay compensation to the Examiners . . . even though they regularly worked over forty hours during their employment with the Company." (*Id.* at 12 (emphasis added).) Plaintiffs

cannot, however, point to any common policy or practice the adjudication of which would entitle them to relief under the FLSA or demonstrate that this case is suited to collective treatments.

For example, in their brief, Plaintiffs aver that all putative class members had "similar duties", "were paid in a similar manner", "had income reported on a 1099", and "were subjected to common pay policies."  (Pls.' Mem. at 12-13.)  However, even if true, these points of similarity are insufficient to establish that Plaintiffs and the putative class members are "similarly situated" for purposes of meeting the modest factual showing standard for the simple reason that these facts in no way establish FLSA liability.  Indeed, these alleged facts do not even establish that Plaintiffs were misclassified as independent contractors.  As discussed in more detail below, that determination—i.e., whether Plaintiffs were misclassified—requires a highly individualized inquiry and cannot be adjudicated on a class-wide basis.

The only other purported fact that Plaintiffs expressly cite to in their brief to show a common policy or plan that unites them and the putative class members is that they allegedly "regularly worked over 40 hours per week."  However, this allegation, even if true (which HH disputes), is not a common policy or plan.  It is merely a conclusory allegation that must be supported by specific facts and must be amenable to proof on a representative basis.  As discussed in more detail below, the facts necessary to support this claim are individual in nature, complex and multi-faceted, and not subject to en masse adjudication.

Indeed, the evidence submitted by Plaintiffs and the declarants establishes that HH did *not* maintain a common policy of classifying all PEs as independent contractors.  Plaintiffs recognize that some PEs "use Hooper Holmes only as third party billing service." (Pls.' Mem. at 11 *note* 3.)  Additionally, HH's records show that declarant Margaret King performed examiner services as a W-2 employee, not a 1099 contractor; while declarants Kristie Martin and Jessica

Kuykendall performed examiner services during the statutory period only for independent examiner services companies and did not receive a 1099 from HH. Ornelas' and Oswald's testimony provides further evidence that there is no common plan or policy to classify all examiners as independent contractors receiving 1099s from HH. *See* Ornelas Decl. ¶ 8.

Moreover, there is no evidence before the Court of a "policy" or common decision-maker who classified Plaintiffs or the declarants as independent contractors. In fact, neither Plaintiffs nor the declarants identify the person(s) who classified them as independent contractors. As Plaintiffs allege in the moving papers, such decisions appear to have occurred at the respective branches (approximately twelve) where they performed services. (Pls.' Mem. at 8.)

Ultimately, Plaintiffs' theory is that all contract examiners are misclassified (which HH denies), and therefore that notice should issue. However, misclassification in and of itself does not violate the FLSA. All that a finding of misclassification means is that the FLSA's overtime provision applies to the workers found to be employees, not that an overtime violation occurred. This is not a common policy or practice. *See, e.g.*, *Harriel*, 2012 U.S. Dist. LEXIS 97527, at *16 (plaintiff's performance of non-exempt tasks and likely misclassification did not support a nationwide inference that all others in his position similarly were misclassified); *see also TJX Cos.*, 853 F. Supp. 2d 317, 323 (E.D.N.Y. 2012) ("As numerous courts . . . have held, the mere classification of a group of employees—even a large or nationwide group—as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members 'similarly situated' for § 216(b) purposes."); *Pfaahler v. Consultants for Architects, Inc.*, 2000 U.S. Dist. LEXIS 1772, *4 (N.D. Ill. Feb, 8, 2000) ("Those who are 'independent contractors' would not be similarly situated with [Plaintiff], who claims he is an 'employee.'") (Alvarez Cert. Exh. U).

18

**III.    PLAINTIFFS CANNOT DEMONSTRATE THAT THEY ARE SIMILARLY SITUATED TO THE PUTATIVE CLASS WITH RESPECT TO ALLEGED EMPLOYEE STATUS BECAUSE THIS INQUIRY IS HIGHLY INDIVIDUAL AND FACT-SENSITIVE.**

The FLSA covers only the employer-employee relationship and is inapplicable to independent contractors.    Therefore, before determining whether HH can have violated the FLSA, the Court or jury must first determine whether the FLSA even applies, i.e., whether Plaintiffs and each putative class member were misclassified.    *See Pfaahler*, 2000 U.S. Dist. LEXIS 1772, at *4; *see also Scott v. NOW Courier, Inc.*, 2012 U.S. Dist. LEXIS 43710, *19-20 (S.D. Ind. Mar. 29, 2012) (The plaintiffs "cannot recover on their claims under [the FLSA] unless the Court is persuaded that they are, under the facts of their case and the applicable principles of law, employees rather than independent contractors.") (Alvarez Cert. Exh. V); *Andel*, 280 F.R.D. at 294-96 (before determining whether a common decision, policy, or plan exists, the court "must resolve first whether the FLSA even covers each Plaintiff and, therefore, each putative plaintiff").

In *Pfaahler*, the court denied the plaintiff's motion for conditional certification of a putative class of independent contractors.    2000 U.S. Dist. LEXIS 1772, at *4.    The court noted that in order to resolve whether each putative class member was an employee rather than an independent contractor, "the court would be required to make a fact-sensitive, individual determination as to the nature of each potential claimant's employment relationship" and "the claimant's relationship with various corporate clients[.]"    *Id.*

To determine whether an individual classified as an independent contractor is actually an employee under the FLSA, the Third Circuit employs a six-factor "economic reality" test, which requires an individual analysis of:

> 1.    The degree of the alleged employer's right to control the manner in which the work is to be performed.

2. The alleged employee's opportunity for profit or loss depending upon his managerial skill.
3. The alleged employee's investment in equipment or materials required for his task, or his employment of helpers.
4. Whether the service rendered requires a special skill.
5. The degree of permanence of the working relationship.
6. Whether the service rendered is an integral part of the alleged employer's business.

*Bamgbose*, 684 F. Supp. 2d at 669 (citing *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1293 (3d Cir. 1991)). "This inquiry centers on whether the putative employee is economically dependent upon the putative employer." *Li v. Renewable Energy Solutions, Inc.*, 2012 U.S. Dist. LEXIS 22312, * 16 (D.N.J. Feb. 21, 2012) (citations omitted) (Alvarez Cert. Exh. W).

Whether an independent contractor PE is dependent upon HH for income is a determination would require analysis of, *inter alia*, the tax returns of all putative class members, a review of the six factors discussed above, and depositions of each putative class member. The *Li* decision—a single-plaintiff FLSA case alleging independent contractor misclassification— illustrates the analysis required of the Court before addressing whether HH violated the FLSA. The court in *Li* analyzed "the total economic realities" of each relationship including, *inter alia*, whether the putative employer was the sole source of income, whether the plaintiff held other employment, whether the plaintiff "was in business for himself", whether the plaintiff "treated the job like a normal employment", and so on. *Id.* at *26.

Here, Plaintiffs fail to make even a minimal showing that they are similarly situated to the putative class with respect to applying the economic reality test. Indeed, conspicuously absent from Plaintiffs' moving papers is any meaningful discussion of this issue or how they could possibly avoid extensive, individualized examinations of each putative class member's relationship with HH and overall economic circumstances. Simply put, there is no common

application or answer to the crucial question of FLSA coverage and, therefore, this matter is not suitable for conditional certification.

The deposition testimony of each named Plaintiff undermined even the scant evidence submitted in support of the motion and in numerous ways reinforced the need for individualized testimony to decide the misclassification issue. First, directly contrary to his declaration, Ornelas admitted that he earned income from sources other than HH (e.g., employment, another paramedical examination company, and unemployment compensation), while Oswald invoked her Fifth Amendment privilege over and over again in response to questions regarding reporting income from other sources (e.g., W-2 or 1099). Second, contrary to his declaration, Ornelas' tax return showed that he considered himself an independent contractor and took tens of thousands of dollars in deductions on that basis. And since Oswald invoked the Fifth Amendment, the Court can only conclude that Oswald similarly took self-employment deductions and considered herself an independent contractor.[7]  Third, both Plaintiffs testified that they controlled their respective schedules, the geographic regions in which they were willing to accept appointments, the dates on which they were willing to accept appointments, and the times in which they were willing to accept appointments, all of which contradict their declarations. Fourth, the Plaintiffs—and the declarants for that matter—fail to identify any specific supervisor of theirs at HH, or the level of control over the manner in which they performed their tasks. Fifth, Plaintiffs demonstrated the lack of permanence of any relationship between them and HH.

Similarly, two declarants (Kuykendall and Martin) earned income exclusively from other entities; another (Fears-Curry) is a physician who operates her own business; a fourth (King) is actually employed by HH; and the records of a fifth (Johnson) demonstrate anything but

---

[7]  *See* Part V, *infra*.

permanency or reliance for income on HH given the relatively minimal number of appointments completed in the statutory period and the weeks—18 out of 31 (i.e., 58% of the weeks during the statutory period)—in which she completed *no appointments and received no income* from HH.

Moreover, each contractor executed an Agreement acknowledging his or her status as an independent contractor and that he or she was free to set hours of activity and to decline referrals. (Alvarez Cert. Exhs. J, K).  If a putative class member asserts facts contrary to that Agreement, it will be necessary to depose that individual to probe the alleged disconnect between the terms of the written contract and the individual's perception of the relationship with HH.

Plaintiffs thus plainly failed to demonstrate they are similarly situated to the putative class with respect to applicability of the FLSA.   Conditional certification under such circumstances simply would not result in the sort of efficient litigation and disposition of claims collective actions are meant to promote.

**IV.   WHETHER PUTATIVE CLASS MEMBERS PERFORMED SERVICES FOR MORE THAN FORTY HOURS IN A WEEK IS AN ENTIRELY INDIVIDUALIZED MATTER THAT IS NOT AMENABLE TO COMMON PROOF.**

Even if the Plaintiffs were somehow to clear the hurdle of showing that the overtime provision applies to each and every member of the putative opt-in class across the board, in order to establish *liability* and *damages* for unpaid overtime Plaintiffs and the putative class must establish that they all performed services in excess of forty hours in a given week during the statutory period.  29 U.S.C. § 207(a)(1).  On this record, it is plainly *impossible* for Plaintiffs to meet the "similarly situated" standard with respect to this inquiry because independent contractor PEs did not track hours spent on appointments, and the amount of time spent completing exams, paperwork, and traveling is individual in nature and not subject to a common policy or plan.

Determining whether any particular putative class member performed services for HH for more than 40 hours in a week (and if so, how many) requires an individualized fact-intensive

inquiry into the details of each week.  This includes the number of appointments completed per day, the distance between appointments, the traffic conditions at the time, the complexity of the appointments, the client's medical history, the client's level of cooperation, and the complexity of the paperwork required for each appointment.  Not surprisingly, Plaintiffs fail to address any of these issues in their motion and rely upon nothing but pure speculation and generalized estimates in support of their claims that HH violated the FLSA.  *See Szymczyk*, 656 F.3d at 192-93 ("a plaintiff must produce some evidence, 'beyond pure speculation'").

For example, Oswald testified that she could not identify a single specific week in which she spent more than forty hours performing services.  (Alvarez Cert. Exh. B at 198:23 to 199:20.)  Moreover, Oswald admitted she could not even determine whether she spent more than 40 hours in a week through review of her production reports (i.e., appointments completed for each week) because several unrecorded variables needed to be considered including the functions performed, distances traveled, and paperwork completed.  (*Id.* at 199:21 to 200:14.)  Similarly, Ornelas testified that he did not record his hours and could only speculate as to whether he actually performed services more than 40 hours in a week.  (Alvarez Cert. Exh. A at 63:6-17, 83:6 to 91:24.)  In particular, Ornelas admitted that he could not determine how long any appointment took to complete or which appointments took longer than others.  (*Id.* at 87:20 to 88:4.)  In fact, based upon their own testimony and estimates, it is doubtful that either named Plaintiff ever spent more than 40 hours during his or her busiest weeks for HH.  (Alvarez Cert. Exh. A at 240:2-16, 255-62; Exh. B at 200:21 to 201:8.)  And Johnson—who completed a maximum of *5 appointments* in a single week—must testify and produce records as to how or why it took her more than 40 hours to complete appointments that Plaintiffs would estimate required anywhere from 3 to 5 hours to finish.

Plaintiffs' testimony ultimately demonstrates that a detailed inquiry into the number of appointments completed, types of examinations performed, administrative paperwork required, distances between appointments, traffic, and routes traveled for each putative class member is simply unavoidable even to *estimate* the number of hours spent in a given week. Thus, Plaintiffs cannot demonstrate that they are similarly situated with regard to spending more than 40 hours in a given week performing services for HH.

## V.   PLAINTIFFS ARE NOT ADEQUATE CLASS REPRESENTATIVES.

Although the Court does not make credibility determinations at this stage of the proceeding, the evidence offered by the two Plaintiffs is nonetheless so uniquely suspect and potentially deficient that the Plaintiffs cannot be viewed as adequate class representatives, even at the conditional certification stage.

It is well established in civil cases that a party may assert a Fifth Amendment privilege at her own peril, and the Court may draw negative inferences against the party who refuses to testify. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"); *SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 190 (3d Cir. 1994) ("[R]eliance on the Fifth Amendment in civil cases may give rise to an adverse inference against the party claiming its benefits . . . [u]se of the privilege in a civil case may, therefore, carry some disadvantages for the party who seeks its protection."). The Third Circuit has identified the policy consideration underlying the adverse inference. "[I]nvocation of the Fifth Amendment poses substantial problems for an adverse party who is deprived of a source of information that might conceivably be determinative in a search for the truth." *See Graystone Nash*, 25 F.3d at 190-91.

Here, as set forth above, Oswald invoked the Fifth Amendment in response to critical deposition questions regarding her classification as an independent contractor. Specifically, Oswald refused to answer questions about deductions taken for self-employment, business expenses, income from self-employment, and W-2 income, among other topics. Under these circumstances, a negative inference should be drawn with respect to those aspects of Oswald's claim, i.e., that Oswald received W-2 income during the statutory period from other entities, received 1099 income from entities other than HH during the statutory period, took significant deductions for business expenses, and considered herself an independent contractor. Therefore, Oswald cannot establish that she is misclassified as an independent contractor. Nor should Oswald be allowed to prosecute her claim, because she refused to provide HH critical evidence plainly relevant to Oswald's independent contractor classification. It would be patently unfair to allow Oswald to use the Fifth Amendment as both a shield and a sword, allowing her to continue pressing her misclassification argument before this Court while insulating that claim from meaningful discovery and cross-examination. *A fortiori*, she should not be permitted to press that claim on behalf of thousands of other individuals.

Similarly, Ornelas is an inadequate class representative based on his blatant contradiction of his sworn tax returns. Under these circumstances he should be estopped from pursuing a claim that he was not an independent contractor when he previously received tens of thousands of dollars in tax deductions based on his contrary assertion to the Internal Revenue Service.

## VI. THE SCOPE OF THE NOTICE PLAINTIFFS SEEK IS VASTLY OVERBROAD AND NOT CONSISTENT WITH THE CLASS THEY ASK TO REPRESENT.

HH vehemently opposes Plaintiffs' motion for conditional certification and steadfastly maintain that Plaintiffs have not met their burden. Notwithstanding this position, if the Court

determines that notice should be given to potential class members, HH submits that the notice

Plaintiffs present for approval is overbroad and should be limited as discussed below.

**A.      Plaintiffs' Request To Provide Notice Is Overbroad And Internally Inconsistent With The Class Plaintiffs Seek To Represent.**

To begin with, Plaintiffs' request to provide notice to all contract examiners regardless of

whether they spent more than 40 hours in a week performing services for HH is overbroad

because it is inconsistent with the class they seek to represent.  Specifically, Plaintiffs define the

class as all contract examiners performing services for HH within the last three years whose

income was reported on IRS Form 1099 "who worked in excess of 40 hours in one or more

workweeks" and "were not compensated at one and one-half times their regular rate of pay for

all hours worked in excess of 40 hours in one or more workweeks."  (ECF Docket No. 25, Am.

Compl. ¶ 47.)  Of course, Plaintiffs need to limit their class to those examiners who have

performed services "in excess of 40 hours in one or more workweeks" because, without that fact,

there is no FLSA violation, even assuming misclassification.

Notwithstanding this asserted formula, Plaintiffs actually ask this Court to authorize

notice to "to each of the contractor examiners *who worked for Defendants within the last three

years*".  (Pls.' Mem. at 13.)  However, this notice is not tailored to and goes far beyond the

potential class members as defined by Plaintiffs.  In this regard, Plaintiffs' request should be

denied.  As set forth above, this inconsistency reinforces the deficiency in Plaintiffs' case, i.e.,

that there is no way of knowing whether an examiner "worked in excess of 40 hours in one or

more workweeks" without individual testimony from each examiner that opts into this collective

action.  Moreover, potential class members should not be permitted to self-select their

participation in the putative class, further demonstrating that the class is unascertainable.

*Agostino v. Quest Diagnostics, Inc.*, 256 F.R.D. 437,478 (D.N.J. 2009) (the prospective plaintiffs

"must propose a class definition that is readily ascertainable based upon objective criteria."). In any event, Plaintiffs' notice should be consistent with and limited to the class they seek to certify.

**B.      If Authorized, Notice Should Be Limited To Only Those Examiners With At Least 30 Orders In A Given Week.**

In addition to the deficiency described above, if this Court decides that notice should be given to potential class members, i.e., those contractor examiners who performed services for more than 40 hours in any week then, based on the testimony of each named Plaintiff, notice should issue to only those contractors who performed at least 30 examinations in a given week.

The logic underlying this figure is seen through the deposition testimony of Ornelas, who estimated that the average appointment took 37 minutes plus an additional 15 minutes to complete post-appointment paperwork.  Based upon Ornelas' estimates, a PE would need only 26 hours to complete 30 appointments in a single week, leaving an additional 14 hours for travel (i.e., almost three hours per day for a five-day week) before the individual would exceed 40 hours for the week.  These projections are more than reasonable.  In sum, the 30-appointment threshold would permit the parties to limit notice to those examiners who have any chance at being in the putative class.[8]

---

[8]      HH notes that "the Supreme Court has rejected the notion of 'Trial by Formula' in which a sample set of the class members is selected, liability and damages for those class members is determined, and the percentage of valid claims and the average damages are imputed to the class as a whole, all without any individualized proceedings." *Amir v. Sunny's Executive Sedan Svc.*, 1:13-cv-161, at p. 3 (E.D. Va. July 30, 2013).

**C.     If Authorized, Notice Should Be Limited To Only Those Branches From Which Potential Class Representatives Performed Services.**

If the Court concludes that Plaintiffs have met their burden at this initial stage, notice nonetheless should be limited to only those branches associated with Plaintiffs or declarants who constitute potential class members.  For example:

1. Margaret King was a W-2 employee, not a 1099 contractor for HH.
2. Kristie Martin and Jessica Kuykendall performed examiner services during the statutory period only for separate affiliate examiner services companies and did not receive a 1099 from HH.
3. Ponchita Alford did not perform any services for HH in the applicable limitations period and failed to allege she worked more than 40 hours.

The remaining two declarants, Angela Fears-Curry and Diane Johnson, both perform services in Alabama, leaving only one geographical branch covered by the declarants.

Ultimately, if the Court decides that notice should be authorized, it should nevertheless be limited to the locations associated with the named Plaintiffs.  Alternatively, and at most, the branches of declarants (Fears-Curry and Johnson) could be included.

## CONCLUSION

For these reasons, HH respectfully requests that the Court deny with prejudice Plaintiffs' motion for conditional certification.

Respectfully submitted,

JACKSON LEWIS LLP
220 Headquarters Plaza
East Tower, 7th Floor
Morristown, New Jersey 07960
(973) 538-6890

By: s/Gregory T. Alvarez
Gregory T. Alvarez
James M. McDonnell

August 16, 2013

4852-3021-4165, v. 1

28